## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Carla S. Ferguson, | : | Case No. 3:08 CV01904 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423.  Pending are the parties' briefs and Plaintiff's Reply (Docket Nos. 14, 18 and 19).  For the reasons set forth below, the Magistrate recommends that the Court remand the case to the Commissioner pursuant to sentence four of 42 U. S. C. § 405(g) and terminate the referral to the Magistrate.

## I.  PROCEDURAL BACKGROUND

Plaintiff applied for DIB on June 10, 2005, alleging that she had been disabled since April 26, 2005 (Tr. 58-67).  Her application was denied initially and on reconsideration (Tr. 38-40, 42-44).  On June 21, 2007, Plaintiff, represented by counsel, and Vocational Expert (VE) Joe Thompson, appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) John Pope (Tr. 321).  On

January 25, 2008, the ALJ issued an unfavorable decision (Tr. 15-23).  The Appeals Council denied Plaintiff's request for review on June 11, 2008 (Tr. 5-7).  Plaintiff filed a timely request for judicial review in the United States District Court for the Northern District of Ohio, Western Division.

## II.  JURISDICTION

This Court exercises jurisdiction over review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## III.  FACTUAL BACKGROUND

At the time of hearing, Plaintiff, a high school graduate, was 41 years of age, single, 5'6" tall and weighed 238 pounds (Tr. 327-328).  She and her two daughters, ages 12 and 19,  lived with her mother (Tr. 328).

Plaintiff worked as a volunteer at the government building one day per month to qualify for food stamps (Tr. 330-331).  Plaintiff was last employed in 2002 as a cashier.  She was terminated because of excessive absences (Tr. 329).  During the past fifteen years, Plaintiff had also been employed at Goodwill Industries hanging clothes (Tr. 330).

Plaintiff suffered from severe asthma, hypertension, psychosis, difficulty concentrating and persistent shortness of breath (Tr. 332, 335, 339, 341).  Treatment for her medical impairments included using a nebulizer every four hours, taking high blood pressure medication and a mood stabilizer and counseling with a psychiatrist and social worker (Tr. 332- 335, 339).  The shortness of breath was a side effect of persistent inhaler use and the side effect of the mood stabilizer was insomnia (Tr. 335, 340). Walking and climbing stairs precipitated pain (Tr. 342).

Plaintiff could sit for one hour, stand "not too long" or approximately one half hour, and walk

for 45 minutes during an eight-hour workday (Tr. 332, 342, 343). Plaintiff had difficulty lifting and carrying objects (Tr. 332). Plaintiff's treating physician advised her against climbing stairs and exposure to paint or fumes. He recommended that she perform sit down jobs in an air conditioned environment (Tr. 334). Despite knee problems, Plaintiff did not think she would have a problem physically using hand or foot controls (Tr. 343, 344).

During a typical day, Plaintiff arose between 9:00 A.M. and 10:00 A.M., helped her twelve year old child prepare for school, bathed, groomed and dressed herself, did laundry and watched television (Tr. 335, 336, 337). After lunch Plaintiff took a one hour nap, rode with a friend to pick up her daughter at approximately 3:30 P.M., helped her daughter with homework and prepared dinner at approximately 5:00 P.M. After dinner, Plaintiff sometimes walked for one half a block and returned to read books (Tr. 336, 337, 338). Plaintiff retired at 10:00 P.M. If weather permitted, Plaintiff occasionally shopped for groceries (Tr. 337). Plaintiff attended church once monthly (Tr. 340, 341).

The VE testified that a hypothetical individual in the age range of 36 to 41, educated at the high school graduate level, limited to light work, with only occasional kneeling and crouching and avoiding exposure to extreme cold and heat, humidity and pulmonary irritants, would be capable of performing the cashier or sorter position as they are typically performed (Tr. 346). Unskilled entry level work for the hypothetical individual would include shipping and receiving weigher, food preparer and other cashier positions. Consistent with the DICTIONARY OF OCCUPATIONAL TITLES, there are approximately 40,000 light, unskilled positions and approximately 10,000 sedentary jobs that would accommodate the hypothetical plaintiff (Tr. 347, 348). The only factor in Plaintiff's testimony that would eliminate employment was frequent absences of one to two days (Tr. 348, 349).

3

## IV.  **MEDICAL EVIDENCE**

Under the supervision of Dr. Philip Lekowski, either a physician's assistant or family nurse practitioner monitored Plaintiff's asthmatic attacks and medication from February 25, 2003 through February 24, 2005 (Tr. 119-145).

On March 19 and 26, 2003, Plaintiff was treated for acute exacerbation of asthma and hypertension (Tr. 173, 174, 177).  There was no definite radiological evidence of an acute pulmonary process (Tr. 181).  Plaintiff was treated for sinusitis in May 2003 (Tr. 149).  No acute cardiopulmonary process was observed on May 16, 2003 (Tr. 150).

In August 2003, Plaintiff underwent a pulmonary function test (Tr. 148).  On October 8, 2003, she was treated for exacerbation of bronchial asthma with steroids, antibiotics and a bronchodilator (Tr. 112).  She was later diagnosed with severe, persistent asthma with bronchospasm (Tr. 116).  Her chest X-ray was unremarkable (Tr. 117).

On April 4, 2004, Plaintiff was prescribed two distinct breathing treatments for an upper respiratory infection (Tr. 81).  Her breathing difficulties were resolved after hospitalization on April 30, 2004 (Tr. 108, 110).  On May 5, 2004, Plaintiff underwent an electrocardiogram to ascertain the source of unspecified chest pain (Tr. 95).  The results were non-revealing.  There was no evidence of ischemia or displacement (Tr. 104).  The computed tomography (CT) scan showed no focal pathology (Tr. 105).  The chest x-ray was unremarkable (Tr. 106).

Dr. Daniel Pipoly certified that from October 16, 2000 through July 14, 2004, Plaintiff's height was 5'6" and she weighed an average of 238 pounds (Tr. 153).  During the course of his care, Plaintiff's asthma was controlled (Tr. 155, 156).  He found that on November 17, 2003, Plaintiff had a severe airflow obstruction (Tr. 158).  In December 2004, he found the amount of forced air that Plaintiff could

4

forcefully exhale in one second was severely reduced and the maximum volume of air that she could exhale after maximum inhalation was moderately reduced (Tr. 157).  In February 2005, he opined that Plaintiff could work subject to restrictions related to climbing, lifting or climbing stairs – no more than twice daily (Tr. 154).

She was treated again for asthma with acute exacerbation on September 24, 2004 (Tr. 85, 90). No acute chest abnormality except for congestion of mild hyperinflation was discovered (Tr. 93).

Plaintiff was treated for swelling in her right knee on October 5, 2004 (Tr. 127, 129).  The pain was attributed to a small effusion and lateral patellar dislocation (Tr. 146).  Views of bilateral knees were negative for deformity (Tr. 147).

On November 24, 2004, Dr. Walter Holbrook opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour work day provided she stand and walk for only thirty minutes at a time and sit about six hours in an eight-hour workday (Tr. 160).  Plaintiff was limited to occasional crouching and crawling, and avoiding exposure to extreme cold, extreme heat, noise and fumes, odors and gases (Tr. 163).

During the course of an eight-day hospitalization beginning May 1, 2005, Plaintiff was prescribed antibiotics and steroids to resolve symptoms of asthma exacerbation and bronchitis (Tr. 232-233, 235, 238-251, 265).  Plaintiff was diagnosed with asthma exacerbation, obstructive sleep apnea, obesity, acute bronchitis and hypertension (Tr. 263).  The lateral and posterial/anterior views of Plaintiff's chest showed no acute pathology (Tr. 258).  The results from the venous scan of Plaintiff's legs were normal (Tr. 259).

On May 12, 2005, Plaintiff was admitted for mental health services because she was psychotic, paranoid, delusional and hallucinating (Tr. 194).  It was suspected that the psychosis was steroid-

induced (Tr. 212).  A treatment regimen, excluding steroids, and supportive therapy was employed and her mood improved significantly prior to discharge on May 16, 2005 (Tr. 194, 212-213, 214).

The results from the initial psychiatric evaluation, conducted on June 16, 2005, by Dr. Satwant Gill, showed a history of psychotic disorder secondary to steroid use, moderate to severe stressors and moderate symptoms or any moderate difficulty in social, occupational, or school functioning (Tr. 271).

Plaintiff presented to the emergency room on September 21, 2005, for treatment of asthma exacerbation (Tr. 277).  Immediately, an aerosol treatment was administered  (Tr. 283).

Plaintiff was treated on an emergency basis for difficulty breathing and/or dyspnea on September 26 and October 1, 2006 (Tr. 306, 307).

During followup care on November 3, 2006, Dr. Srinivas Katragadda, a Fellow of College Chest Physicians, determined that Plaintiff was doing well since her discharge from the hospital.  He noted that Plaintiff had multiple drug allergies (Tr. 298).  When he saw Plaintiff in February 2007, however, the pulmonary function tests had been completed, showing a stage III obstructive ventilatory defect (Tr. 300, 302).  The defect was improved with bronchodilators (Tr. 300).

Plaintiff underwent a spirometry test on February 9, 2007 (Tr. 308).  Plaintiff's asthma was under control, her appetite was good and she was sleeping well as of May 2, 2007.  Plaintiff's mood was not labile.  Plaintiff did not demonstrate a formal thought disorder or evidence of delusional thinking (Tr. 289).  Drug therapy, excluding  cortical steroids, was successful in controlling her symptoms (Tr. 289-297).

## V.  STANDARD FOR DISABILITY

To qualify for DIB, a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Act.  42 U. S. C.

6

§ 423 (Thomson Reuters/West 2009).  "Disability" as defined in the Act, denotes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context)).

To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that result in death or can be expected to last for a period of twelve months and the impairment renders the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy.  42 U.S.C. § 423(d)(2) (Thomson Reuters/West 2009).  Regardless of the actual or alleged onset of disability, the claimant is entitled to benefits beginning with the first month covered by the application in which the claimant meets all of the other requirements for entitlement.  20 C. F. R. § 404.316 (Thomson Reuters/West 2009).

To determine disability, the Commissioner has established a sequential evaluation process for disability determinations.  20 C.F.R. § 404.1520 (a)(4) (Thomson Reuters/West 2009).  First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled.  20 C.F.R. § 404.1520 (a)(4) (i) (Thomson Reuters/West 2009).

Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled.  20 C.F.R. § 404.1520 (a)(4) (ii) (Thomson Reuters/West 2009).

Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments. 20 C.F.R. § 404.1520 (a)(4) (iii) (Thomson Reuters/West 2009).  If the impairment is listed or is

medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. § 404.1520 (a)(4) (iii) (Thomson Reuters/West 2009).

Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled.  20 C.F.R. § 404.1520 (a)(4) (iv) (Thomson Reuters/West 2009).

Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. 20 C.F.R. § 404.1520 (a)(4) (v) (Thomson Reuters/West 2009).

During the first four steps, the claimant has the burden of proof.  *Walters v. Commissioner of Social Security*, 127 F. 3d 525, 529 (6th Cir. 1997) (*citing Young v. Secretary of Health and Human Services*, 925 F.2d 146, 148 (6th Cir. 1990); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987)).  This burden shifts to the Commissioner only at Step Five.  *Id*.

## VI.  ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings:

1.  Plaintiff met the insured status requirements of the Act through September 30, 2007.

2.  Plaintiff had not engaged in substantial gainful activity since December 13, 2002, the alleged onset date of disability.

3.  Plaintiff had severe impairments of chronic obstructive pulmonary disease, asthma and steroid induced psychosis.

4.  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P,

8

Appendix 1.

5.  Plaintiff had the residual functional capacity to perform a full range of sedentary work provided she never climb ladders, ropes, scaffolds, ramps or stairs. Plaintiff could kneel and crouch occasionally. Plaintiff had to avoid even moderate exposure to extreme cold or heat, humidity and pulmonary irritants. She is limited to simple, repetitive tasks.

6.  Plaintiff was unable to perform any past relevant work.

7.  Plaintiff, a "younger individual," with a high school education, the ability to communicate in English and the aforementioned residual functional capacity, could perform work that existed in significant numbers in the national economy.

8.  Plaintiff was not under a "disability," as defined in the Act, at any time from December 13, 2002 through January 25, 2008.

(Tr. 15-23).

## VII. STANDARD OF REVIEW

Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security,* 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)). The decision must be affirmed if the ALJ's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision. 'Substantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept. ' " *Foster v. Halter,* 279 F.3d 348, 353 (6th Cir. 2001) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983) (*quoting Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). Furthermore, the court must defer to an agency's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Id.* (*citing Key, supra,* 109 F.3d at 273).

9

# VIII.  DISCUSSION

## I.  PLAINTIFF'S BRIEF

Plaintiff seeks reversal of the Commissioner's decision on the following bases:  First, the ALJ erred in failing to find that her impairment meets 3.03A of the Listing.  Second, the ALJ failed to properly consider her mental impairment.  Third, the ALJ failed to consider that Plaintiff is obese. Fourth, the ALJ"s credibility finding is not supported by substantial evidence.  Fifth, the ALJ failed to consider the side effects of Plaintiff's medications.  A discussion of Plaintiff's arguments follows.

### 1.  THE ALJ ERRED IN FAILING TO FIND THAT PLAINTIFF'S IMPAIRMENTS MEET THE LISTING.

Plaintiff claims that her impairments are of the severity to meet Section 3.03A of the Listing, chronic asthmatic bronchitis.  Consequently, she is disabled.  Defendant contends that Plaintiff has not met the burden under Section 3.03A.  Specifically, the basic forced expiratory volume measured in the first second ($FEV_1$) showed values that were well above the listed levels.  The test results do not indicate pulmonary dysfunction.

To demonstrate compliance with Section 3.03A of the Listing, the claimant must have asthma with chronic asthmatic bronchitis, evaluated under the criteria for chronic obstructive pulmonary disease in 3.02A, chronic obstructive pulmonary disease, due to any cause, with the $FEV_1$ equal to or less than the values corresponding to the person's height without shoes.  Spirometry is satisfactory for measuring $FEV_1$ and FVC.  Initially, a one second forced expiratory volume and forced vital capacity test are administered.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 3.00E. *Documentation of Pulmonary Function Testing,* ¶ 1 (Thomson Reuters/West 2009).  Spirometry should be repeated after administration of an aerosolized bronchodilator.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 3.00E, *Documentation of Pulmonary Function Testing*, ¶ 2 (Thomson Reuters/West 2009).  Pulmonary function studies performed to access

10

airflow obstruction without testing after bronchodilators cannot be used to assess levels of impairment in the range that prevents gainful work activity.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 3.00E, *Documentation of Pulmonary Function Testing*, ¶ 2 (Thomson Reuters/West 2009).  If a bronchodilator is not administered, the reason should be clearly stated in the report.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 3.00E, *Documentation of Pulmonary Function Testing*, ¶ 2 (Thomson Reuters/West 2009).

In this case, there were three tests for pulmonary function.  First, the respiratory study completed on February 9, 2007, showed a post drug scale of 1.40.  Plaintiff's height without shoes is 67 inches.  The attendant $FEV_1$ value specified in Table 1, must equal or be less than 1.35.  Since the $FEV_1$ value from the respiratory study completed on February 9th is greater than the valued in Table 1, there is no evidence to support a finding of  pulmonary deformity.

Second, the respiratory study completed on December 13, 2004, does not comply with the specific regulations regarding documentation of pulmonary function testing (Tr. 157).  Dr. Pipoly conducted a pulmonary function test, administering the first expiratory maneuvers.  Although it is not included on the report itself, it is clear from the attendant narrative, that Dr. Pipoly did not administer a post-drug test because Plaintiff showed improvement in her severe air flow obstruction (Tr. 155).

Third, a spirometry was administered on August 11, 2003 (Tr. 148).  The post drug scale was 1.63.  Since this number exceeds 1.35, there was no evidence of pulmonary defect.

The ALJ improperly discounted the pulmonary function test performed on December 13, 2004, as it was not administered consistent with the regulations.  Consequently, Plaintiff cannot show that her impairment meets 3.03 of the Listing.

**2.** **THE ALJ FAILED TO PROPERLY CONSIDER HER MENTAL IMPAIRMENT**.

Plaintiff argues that the ALJ failed to properly consider her mental impairments of the steroid induced psychosis.  Her medical records report that she was paranoid, delusional and psychotic.  The ALJ erred in failing to consider the severity of her mental impairments under 12.03 of the Listing. Defendant argues that the ALJ acknowledged that she had mental health issues; however, she was compliant with taking her psychotropic medication and there is no indication that the treating psychiatrist even suggested her condition was "listing level severity."

Although he did not specifically referred to the listing number,  the ALJ did consider Plaintiff's mental impairments under the Listings (Tr. 19).  He found that Plaintiff failed to satisfy the "paragraph B" criteria and set forth the basis for his finding (Tr. 19). Even if the ALJ were to consider specifically Section 12.03 of the Listing, Plaintiff's mental impairment does not meet or equal that section of the Listing.

12.03 of the Listing, *Schizophrenic, paranoid and other psychotic disorders,* provides:

Characterized by the onset of psychotic features with deterioration from a previous level of functioning.  The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

    A.    Medically documented persistence, either continuous or intermittent, of one or more of the following:
        1.    Delusions or hallucinations; or
        2.    Catatonic or other grossly disorganized behavior; or
        3.    Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:
            a.    Blunt affect; or
            b.    Flat affect; or
            c.    Inappropriate affect; or
        4.    Emotional withdrawal and/or isolation; and
    B.    Resulting in at least two of the following:
        1.    Marked restriction of activities of daily living; or
        2.    Marked difficulties in maintaining social functioning; or
        3.    Marked difficulties in maintaining concentration, persistence, or pace; or

        4.      Repeated episodes of decompensation, each of extended duration; or

C.      Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

        1.      Repeated episodes of decompensation, each of extended duration; or

        2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

        3.      Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.03 (Thomson Reuters/West 2009).

Initially, it appears that Plaintiff had continuous delusions. However, the medical record shows that the Plaintiff's psychotic disorder was episodic. On May 12, 2005, Plaintiff was admitted for mental health services because she was considered psychotic, paranoid, delusional and hallucinating (Tr. 194). It was suspected that the psychosis was steroid-induced (Tr. 212). A treatment regimen, excluding steroids, and supportive therapy was employed and her mood improved significantly prior to discharge on May 16, 2005 (Tr. 194, 212-213, 214). The medically documented evidence of delusions does not show persistence. Accordingly, the delusions are not of the severity to meet the 12.03 of the Listing.

**3.**        **THE ALJ FAILED TO CONSIDER THAT PLAINTIFF IS OBESE.**

Plaintiff claims that the ALJ erred by failing to consider the effects of obesity as discussed in Listing 3.00 (I).

Pursuant to Listing 3.00 (I), the effects of obesity are often associated with disturbance of the respiratory system. 20 C. F. R Pt. 404, Subpt. P, App. 1, Listing 3.00 (I) (Thomson Reuters/West 2009) Disturbance of this system can be a major cause of disability in individuals with obesity. 20 C. F. R Pt. 404, Subpt. P, App. 1, Listing 3.00 (I) (Thomson Reuters/West 2009). The combined effects of obesity with respiratory impairments can be greater than the effects of each of the impairments considered

separately.  20 C. F. R Pt. 404, Subpt. P, App. 1, Listing 3.00 (I) (Thomson Reuters/West 2009).

Therefore, when determining whether an individual with obesity has a listing-level impairment or

combination of impairments, and when assessing a claim at other steps of the sequential evaluation

process, including when assessing an individual's residual functional capacity, adjudicators must

consider any additional and cumulative effects of obesity.  20 C. F. R Pt. 404, Subpt. P, App. 1, Listing

3.00 (I) (Thomson Reuters/West 2009).

The record is replete with diagnoses that Plaintiff is obese (Tr. 90, 110, 237, 241, 243, 246, 249,

263, 265).  During the pulmonary function test, her body mass index was measured at 37.3.  This

measurement places her within the clinical guidelines equivalent of "moderate" obesity.  TITLES II AND

XVI:  EVALUATION OF OBESITY, 2000 WL 33952015, *2, SSR 00-3p (May 15, 2000).

The statute requires that the ALJ consider any additional and cumulative effects of obesity.

There is no indication that the ALJ complied with this procedure.  On remand, the ALJ must consider

the medically documented evidence of obesity and the cumulative effects of obesity on disturbances to

Plaintiff's respiratory system.  Then, the ALJ must assess whether such disturbances are a cause of

disability.

### 4.    THE ALJ'S CREDIBILITY FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

Plaintiff contends that the ALJ's failure to (1) consider that the steroid induced psychosis was

an adequate cause for her failure to comply with treatment and (2) properly evaluate whether she was

a smoker.  Defendant concedes that the medical evidence actually documents Plaintiff as a non-smoker

and argues that  the comment about her non-compliant behavior is reasonably supported by the

evidence.

The ALJ's findings as to credibility are entitled to deference because he or she has the

opportunity to observe the claimant and assess his or her subjective complaints. *Olive v. Commissioner of Social Security*, 2007 WL 5403416, *9 (N. D. Ohio 2007) (*citing Cross v. Commissioner of Social Security,* 373 F. Supp.2d 724, 732 (N. D. Ohio 2005) (*citing Buxton v. Halter,* 246 F.3d, 762, 773 (6th Cir. 2001)). A court may not disturb the ALJ's credibility determination absent compelling reason. *Id.* (*citing Cross*, 373 F. Supp. 2d at 732) (*citing Smith v. Halter,* 307 F.3d 377, 379 (6th Cir. 2001)). The ALJ should consider the following when assessing credibility:  the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment or measures, other than medication, taken to relieve pain. *Id.* (*citing Cross,* 373 F. Supp. 2d at 732) (*citing* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii)).  If the ALJ rejects the claimant's complaints as incredible, he or she must clearly state his reasons for doing so. *Id.* (*citing Cross,* 373 F. Supp. 2d at 732) (*citing Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994)).

Here, the reasons for the ALJ's finding as to credibility are articulated in the decision (Tr. 21). He listed and considered Plaintiff's daily activities; precipitating and aggravating factors; her medications and the side effects and treatment measures (Tr. 20-22).  In assessing the side effects of Plaintiff's medications, he considered the legitimacy of the steroid induced psychosis and whether it was a legitimate reason for failure to comply with treatment.  Even though Defendant concedes that Plaintiff is a non-smoker, there is medically documented evidence that Plaintiff had a smoking history (Tr. 173). Since the ALJ relied on evidence in the record and then gave clear reasons for his adverse credibility finding, the opinion comports with the procedural regulations and is entitled to deference.

### 5.    THE ALJ FAILED TO CONSIDER THE SIDE EFFECTS OF PLAINTIFF'S MEDICATIONS.

Plaintiff argues that the ALJ did not consider the side effects from her consumption of

prednisone and steroids.  In failing to consider the side effects, the ALJ violated 20 C. F. R. § 404.1529.

Since symptoms sometimes are indicative of a more severe impairment that cannot be shown by objective medical evidence alone, the ALJ is required to consider information submitted by the claimant about his or her symptoms.  20 C. F. R. § 404.1529 (Thomson Reuters/West 2009).  Because the claimant's own description of his or her physical or mental impairment is subjective and therefore difficult to quantify, any symptom related functional limitations and restrictions which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in reaching a conclusion as to whether the claimant is disabled.  20 C. F. R. § 404.1529 (c)(3) (Thomson Reuters/West 2009).  Factors relevant to symptoms which will be considered include the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms.  20 C. F. R. § 404.1529(c)(3)(iv) (Thomson Reuters/West 2009).

Although the ALJ did not categorize the side effects in his opinion, he acknowledged the side effects of prednisone and steroids.  In fact, he found that she had a severe impairment–steroid induced psychosis–resulting from the consumption of prednisone and steroids.  Clearly, the ALJ considered the medically documented side effects from taking steroids.  20 C.F.R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters/West 2009).

## II.    PLAINTIFF'S REPLY

In her Reply, Plaintiff asserts five additional claims.  First, the ALJ failed to find that her frequent asthma attacks satisfied 3.03B of the Listing.  Second, the ALJ committed reversible error by failing to comply with SSR 02-01p.  Third, in violation of the provisions in SSR 82-59, the ALJ failed to make appropriate development as to whether the claimant was justified in failing to undergo the

16

prescribed treatment.  Fourth, the ALJ's finding of residual functional capacity does not accurately reflect her abilities.  Fifth, the ALJ did not adopt the restrictions of Dr. Pipoly.  Sixth, the VE's testimony is predicated on flawed hypothetical questions; therefore, it does not constitute substantial evidence.

### 1.    THE ALJ FAILED TO FIND THAT HER IMPAIRMENTS SATISFIED 3.03B OF THE LISTING

Plaintiff contends that her frequent asthma attacks satisfied the B criteria of the Listing 3.03. She had medical documentation of attacks "occurring at least once every 2 months or at least six times a year₁ as required by the listing.  Defendant is adamant that Plaintiff has failed to sustain the burden of proof required to show that she satisfied the requirements of Section 3.03B of the Listing of Impairments.

A claimant meets or equals the Listing of Impairments for asthma if he or she has attacks, in spite of prescribed treatment and requiring physician intervention, occurring at least once every two months or at least six times a year.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 3.03B (Thomson Reuters/West 2009).  Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least twelve consecutive months must be used to determine the frequency of attacks.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 3.03B (Thomson Reuters/West 2009). Attacks are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting, in spite of prescribed treatment and requiring physician intervention, occurring at least once every two months or at least six times a year.  20 C. F. R. Pt. 404,Subpt. P, App. 1, 3.00C (Thomson Reuters/West 2009).

The record shows the following:

1.   Plaintiff had an asthma attack on or about March 19, 2003.  She was treated and released on March 26, 2003 (Tr. 172-180).
2.   Plaintiff had an asthma attack on or about October 8, 2003.  She was hospitalized for approximately five days.
3.   Plaintiff had an asthma attack on April 29, 2004.  She was treated and released (Tr. 81).
4.   Plaintiff had an asthma attack on September 24, 2004.  She was hospitalized for two days (Tr. 84).
5.   Plaintiff had an acute asthma attack on October 5, 2004 (Tr. 128-129).
6.   Plaintiff had an asthma attack on or about May 1, 2005 (Tr. 220).  She was hospitalized for eight days (Tr. 263).
7.   Plaintiff had an asthma attack on September 21, 2005 and was treated at the emergency room and released.

The medical record actually shows that Plaintiff had prolonged symptomatic episodes relating to an exacerbation of her asthmatic symptoms.  The majority of them lasted for more than one day and required medical intervention in the form of intensive treatment.  The medical evidence does not show that the intervention occurred at least once every two months or at least six times annually in either 2003, 2004 or 2005.  Plaintiff has not demonstrated compliance with 20 C. F. R. Pt. 404,Subpt. P, App. 1, 3.03B.

**2.      THE ALJ DID NOT COMPLY WITH THE PROCEDURAL REQUIREMENTS OF SSR-02-1P.**

Plaintiff argues that the ALJ failed to comply with SSR 02-1p which directs the ALJ to consider the combined effects of Plaintiff's obesity with her other impairments.

Obesity has been recognized as a risk factor that increases an individual's chances of developing impairments in most body systems and complicates chronic diseases of the respiratory body system. TITLES II AND XVI: EVALUATION OF OBESITY, 2000 WL 628049, *3, SSR 02-1P (September 12, 2002). Thus, obesity must considered in the sequential evaluation process when determining whether the claimant has a medically determinable impairment and the claimant's impairment(s) are severe.  TITLES II AND XVI: EVALUATION OF OBESITY, 2000 WL 628049, *3, SSR 02-1P (September 12, 2002).

The Magistrate has already determined that the ALJ failed to consider obesity and its effects on

her impairment.  On remand,  the Commissioner shall consider the judgments of Plaintiff's physicians that she is obese and then evaluate her obesity consistent with the provisions of SSR 02-1p.

### 3. THE ALJ FAILED TO FIND THAT PLAINTIFF WAS JUSTIFIED IN FAILING TO UNDERGO TREATMENT.

Plaintiff claims that she was justified in failing to comply with all of the prescribed drug therapy. Specifically, she suffered psychosis as a result of taking steroids.  Plaintiff further claims that the ALJ condemned her for her failure, never considering that she was justified for failing to undergo the treatment prescribed under SSR 82-59.

This policy established in TITLES II AND XVI: FAILURE TO FOLLOW PRESCRIBED TREATMENT, 1982 WL 31384, *1, SSR 82-59 (1982), contemplates that individuals with a *disabling impairment* which is amenable to treatment that could be expected to restore their ability to work, must follow the prescribed treatment to be found under a disability, unless there is a justifiable cause for the failure to follow such treatment.  This policy statement explains the requirements necessary for such a finding, explains the consequences of such action, and illustrates examples of justifiable causes for "failure."  TITLES II AND XVI: FAILURE TO FOLLOW PRESCRIBED TREATMENT, 1982 WL 31384, *1,  SSR 82-59 (1982)

The Magistrate finds that the ALJ did not make her failure to comply with drug therapy an issue to the extent alleged by Plaintiff.  In this case, the ALJ found that Plaintiff was not compliant because there was evidence that she smoked (Tr. 21, 173).  There was no medical evidence that Plaintiff was prescribed treatment to quit smoking, that she would have regained her residual functional capacity if she quit smoking or that if she quit smoking, her capacity to engage in substantial gainful employment would be restored.  Plaintiff's explanation as to why she did or did not continue to smoke is not critical to the determination of whether she can work.

19

**4.      THE ALJ'S FINDING OF RESIDUAL FUNCTIONAL CAPACITY IS INACCURATE.**

Plaintiff contends that since the ALJ failed to consider the side effects of her medication as well as her obesity, the residual functional capacity is inherently inaccurate.

The Listings reinforce this Regulation with regard to obesity by mandating that the adjudicator consider the additional and cumulative effects of obesity when completing the sequential evaluation, including when assessing an individual's residual functional capacity.  Listing 3.00A, 20 C.F.R. Part 404, Subpart P, Appendix 1 (Thomson Reuters/West 2009).

The ALJ's failure to consider the impact Plaintiff's obesity has on her residual functional capacity at Step Four constitutes error.  Remand is appropriate so that the Commissioner may consider the effect of obesity on residual functional capacity.

**5.      THE ALJ DID NOT ADOPT THE RESTRICTIONS IMPOSED BY DR. PIPOLY.**

Plaintiff argues that despite representations to the contrary, the ALJ selectively adopted portions of Dr. Pipoly's reports and misconstrued their content.  Specifically, the ALJ did not adopt the more restrictive limitation related to climbing stairs no more than twice daily in determining residual functional capacity.

The regulations provide that more weight is given to an opinion of a source who has examined the claimant.  20 C.F.R. § 404.1527(d)(1) (Thomson Reuters/West 2009).  When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, controlling weight will be given to that opinion.  20 C.F.R. § 404.1527(d)(2) (Thomson Reuters/West 2009).  In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship

20

and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision.  20 C. F. R. § 404.1527(d)(2) (Thomson Reuters/ West 2009).

Subject to these guidelines, the ALJ found that Plaintiff and Dr. Pipoly had a treating relationship.  However, there were portions of his report that were not supported by objective medical evidence and inconsistent with other treating physician opinions.  The ALJ resolved that Plaintiff's residual functional capacity was more restrictive that any treating physician suggested.  He ultimately adopted an opinion that was consistent with the medical evidence and other treating physician's opinions.  The Magistrate does not find that this approach to opinion evidence review violates the procedures.

## 6.    THE HYPOTHETICAL QUESTIONS WERE FLAWED.

Plaintiff suggests that the ALJ failed to ask a hypothetical question or questions that incorporated a limitation of performing "simple and repetitive tasks," the need to use the inhaler up to four times daily or climb one flight of stairs no more than two times daily.  Plaintiff argues that the failure to incorporate these limitations in the hypothetical question constitutes error.

The Sixth Circuit found that residual functional capacity is distinguishable from the hypothetical question posed to the VE.  *Webb v. Commissioner of Social Security*, 368 F.3d 629, 632 (6th Cir. 2004). Residual functional capacity, an "assessment of the remaining capacity for work" once limitations have been taken into account, is an assessment of what a claimant can and cannot do, not what he/she does

and does not suffer from.  *Id.* (citing 20 C. F. R. § 416.945).  On the other hand, the hypothetical question posed to a VE for purposes of determining whether a claimant can perform other work should be a more complete assessment of the individual's physical and mental state and should include an accurate portrayal of physical and mental impairments.  *Id.* (*citing Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987); *Myers v. Weinberger,* 514 F.2d 293, 294 (6th Cir. 1975) (per curiam).  In essence, the hypothetical question should focus on the claimant's overall state including mental and physical maladies.

The Magistrate concludes that hypothetical questions were not flawed because they failed to include conditions relevant to assessing residual functional capacity.  The assessment of what Plaintiff can and cannot do did not present an accurate portrayal of Plaintiff's physical or mental and physical maladies.  The ALJ did not err in failing to include these descriptions in the hypothetical questions posed to the VE.

## VIV.  CONCLUSION

For the foregoing reasons, the Magistrate recommends that this case be remanded to the Commissioner pursuant to sentence four of 42 U. S. C. § 405(g) to assess the medically documented evidence of obesity consistent with SSR 02-1p, the cumulative effects of obesity on disturbances to Plaintiff's respiratory system and its effect on residual functional capacity.  The Magistrate further recommends that the referral to the undersigned be terminated.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Dated: July 9, 2009

## <u>NOTICE</u>

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto has been filed.

Please be advised that, pursuant to Rule 72.3(b) of the Local Rules for this district, the parties have ten (10) days after being served in which to file objections to said Report and Recommendation. A party desiring to respond to an objection must do so within ten (10) days after the objection has been served.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.